Joseph H. JOHNSTON, Win Myint, William H. May, and Edward Hall

v.

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY and Paul G. Summers, Attorney General for the State of Tennessee.

Court of Appeals of Tennessee, Western Section, at Nashville.

June 23, 2009 Session.

Dec. 10, 2009.

Permission to Appeal Denied by Supreme Court June 7, 2010.

Raymond G. Prince, Nashville, Tennessee, for the Petitioners/Appellants Joseph H. Johnston, Win Myint, William H. May, and Edward Hall.

Susan B. Cain, Lora Barkenbus Fox, and Jeff Campbell, Nashville, Tennessee, for the Respondent/Appellee Metropolitan Government of Nashville and Davidson County.

Mary Ellen Knack, Nashville, Tennessee, for the Respondent/Appellee Paul G. Summers, Attorney General for the State of Tennessee.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

This zoning appeal involves Tennessee's Open Meetings Act. A municipal legislative body began considering legislation to implement a conservation zoning overlay in a neighborhood within the municipality. The ordinance adopting the zoning change passed on the first and second reading. Prior to the final meeting on the subject, members of the legislative body sent numerous emails to each other discussing the proposed zoning change. In addition, prior to the final meeting, some members viewed information on the zoning issue in a non-public conference room in the legislative body's office. The legislative body then adopted the zoning change at a public

meeting. Thereafter, residents of the neighborhood who opposed the zoning change filed the instant lawsuit seeking a writ of certiorari to review the adoption of the ordinance. The petitioner residents argued, *inter alia*, that the email correspondence and the non-public meeting violated the Open Meetings Act, that the enabling statute violated the separation of powers doctrine, and that the enactment of the ordinance violated due process and was arbitrary and capricious. The trial court determined that the legislative body's actions did not violate the Open Meetings Act, and rejected the other challenges to the zoning overlay ordinance. The neighborhood residents appeal. We reverse in part and affirm in part, finding among other things that while the email correspondence constitutes a violation of the Open Meetings Act, the legislative body engaged in a "new and substantial reconsideration" of the issues in the final meeting so as to cure the violation.

## FACTS AND PROCEDURAL HISTORY

In late 2003, representatives of Belmont–Hillsboro Neighbors, Inc. ("BHN"), a neighborhood association, met with members of the Nashville Metropolitan Historic Zoning Commission ("MHZC"). The purpose of the meeting was to discuss implementing a conservation zoning overlay [1] in their neighborhood ("the Overlay"). The zoning overlay would recognize the historical significance of the neighborhood and provide for review of changes to the exterior of the buildings in the neighborhood, to preserve its historic character.

Over the next few months, representatives of BHN and the staff of the MHZC finalized proposed design guidelines and boundaries for the Overlay. The authority to establish an historic district such as the Overlay rests with the local legislative body, here, the Nashville Metropolitan Council ("Council"). The Council representative for the district encompassing the Belmont–Hillsboro neighborhood, Council member Ginger Hausser ("Hausser"), agreed to sponsor the ordinance to implement the Overlay. Affected residents were surveyed to gauge community support for the Overlay.

At the February 1, 2005 meeting of the Council, Hausser introduced an ordinance to implement the Overlay by amending Title 17 of the Metropolitan Code of Laws, the Zoning Ordinance of the Metropolitan Government of Nashville and Davidson County. The ordinance passed on first reading,[2] without any discussion, and the matter was then referred to the Planning, Zoning and Historical Committee (here, the MHZC) and then to the Planning Commission. The MHZC was to make a recommendation to the Planning Commission and to the Council.

On February 16, 2005, the MHZC held a public hearing on the Overlay. The hearing was contentious, with numerous neighborhood residents in attendance. After remarks by audience members and discussion, the MHZC unanimously approved the

---

1. According to the design guidelines ultimately approved by the MHZC, a conservation zoning overlay consists of the following:

 Conservation zoning is a type of overlay zoning, applying in addition to the base or land-use zoning of an area; *conservation zoning does not impact use....*

 ... [C]onservation zoning honors an area's historical significance, but with that recognition, certain exterior work on build-

 ings—new construction, additions, demolition, and relocation—is reviewed to ensure that the neighborhood's special character is preserved.

 (emphasis in original).

2. The record indicates that such an ordinance must pass on three separate readings to be enacted.

proposed Overlay guidelines and designated the Belmont–Hillsboro Conservation District. From there, consideration of the Overlay moved to the Planning Commission.

On February 24, 2005, the Planning Commission held its public hearing on the Overlay. Numerous affected residents attended this hearing as well, with some voicing support for the Overlay and others voicing opposition. At the conclusion of the hearing, the Planning Commission voted unanimously in favor of the Overlay.

Following the Planning Commission hearing, Petitioner/Appellant Joseph Johnston ("Johnston"), a resident of the affected neighborhood, sent one letter to all members of the Council and another letter to Hausser; both letters stated his opposition to the Overlay and his desire to have his property excluded. Johnston enclosed a petition to request an amendment to the ordinance to exclude his property from the Overlay. This effort snowballed and the Council soon received similar requests from numerous affected residents, seeking an amendment to the Overlay ordinance that would allow individual properties to be excluded from the Overlay.

The Council again considered the Overlay at its March 1, 2005 meeting. Many affected neighborhood residents attended the Council meeting; again, some supported the Overlay and others opposed it. A potential exclusion amendment was discussed at the meeting. The Overlay ordinance passed on second reading, and the third reading on the ordinance was scheduled for the first Council meeting in April 2005.

In the interim between the second reading in March and the third reading in April, several Council members sent emails to one another discussing conservation zoning overlays in general, and this Overlay in particular, as well as a potential exclusion amendment. For example, on March 28 and March 29, Council members Adam Dread and John Summers engaged in the following dialogue, copied to all members of the Council:

[Council member Dread at 12:12 PM, March 28, 2005]

As of this date I have recieved (sic) countless emails and phone calls from homeowners who wish to opt out of this overlay. The majority of these folks have lived in this area for a very long time. I can only support the overlay if current homeowners are given the option to opt out. From a Constitutional standpoint, I don't believe the government should "take" (as in any restrictions or value change) a citizen's property unless it is not purely for public use. That is not the case here.

[Council member Summers at 5:39 PM, March 28, 2005]

Any time we make a text change in the zoning code, we effect (sic) every property owner in Davidson County with that change. That is no more pf (sic) a taking of their property rights than it is to enact a historic overlay on an area. It is no difference (sic) than adding a new codes restriction to property county wide that does not exist now. But to allow individual property owners to opt out of an overlay negates the entire purpose of a historic overlay.

Zoning changes made in large areas are always more defensible in court than single property changes. Surely you remember that from law school. To opt these properties out of the overlay is less legally defensible than enacting an overlay with the support of a majority of property owners.

You are correct, if you cannot support the overlay in tact, then you should simply vote against it. Because to opt these

properties out, you are undermining the entire principle and purpose of the overlay. You should either support the district council member if you believe as she does that a majority of the residents want the overlay, or simply vote against it.

In the past the Council has not engaged in trying to amend properties out of an overlay. It should not begin to do so now. To do so would end any efforts at preserving Nashville's historic neighborhood.

[Council member Dread at 9:55 AM, March 29, 2005]

Although I think the potential effect that the an [sic] overlay can achieve can be beneficial, I do think they still turn a city neighborhood into a virtual "subdivision," something I can understand some people not wanting to have imposed on them. Many people do not live in subdivisions because they do not want restrictive covenants, something that overlays do.

Is there not some less drastic means to their end? I understand some of the supporters fears, but honestly think the free market will protect that area of town. This is not a blighted area in need of zoning to "save" it. Further, I personally don't think it is fair or legal to tell someone who has lived in a neighborhood that they cannot sell their small house to a developer and make the same profit someone with a larger home on a similar piece of land would make. In many cases, we are talking about seniors, and the sale of their land is their retirement money.

[Council member Summers at 12:33 PM, March 29, 2005]

There is a lot of misinformation as to what you can and cannot do [when an overlay is put in place].

Again, Richland West End is a prime example of how an overlay still allows you to build big expensive new houses, as well as big expensive additions. There is always a fear of the unknown, but everywhere an overlay has been adopted it seems to have worked well.

I agree that we all have to give due consideration to any minority on an issue, but my commitment on zoning matters when I ran is that I will follow the majority of my constituents, the basis of zoning is all about the common good of the community, not about the individual property owner.

Many of the emails were either directed to or copied to all Council members. Other email exchanges were between individual Council members, consulting on strategy for gaining passage of the Overlay ordinance:

[Council member Hausser at 8:15 AM, April 5, 2005]

John,

Can you work on Sam Coleman, Randy Foster and Tommy Bradley?

Ginger

[Council member Summers at 6:55 AM, April 5, 2005]

Ginger,

I think you should have Ann Roberts, Tim Walker, Keith Durbin, and anyone else you think helpful, maybe Brook Fox, in the back conference room during the Council meeting tonight. You should take Council members back to the room, one at a time and ask them where they are on the Belmont Hillsboro overlay, what their concerns are if they don't give you a firm commitment, try to answer their questions, right then and there.

This gives you a chance to give them the numbers, answer these ridiculous questions, and answer their questions

one on one. It's something you haven't been able to do.

You have about 5 to 8 Council members you need to do this to determine whether you need to move forward or not.

I'll be glad to help.

John

Still others were from affected residents, conveying by email the resident's position on the Overlay ordinance. The email exchanges continued into the afternoon of April 5, 2005, the date on which the April Council meeting occurred.[3]

On April 5, 2005, prior to the scheduled Council meeting, Council members Chris Whitson and John Summers copied the following email exchange to nearly all members of the Council:

[Council member Whitson at 2:19 PM, April 5, 2005]

In short, I am incredibly uncomfortable with the idea that over 150 property owners have requested in writing to be excluded. These are property owners and taxpayers, who have looked at the issue and have actively requested that the Council not "take" their property rights (John Summers, before you whip off an email to me saying that this is not a "taking"—I philosophically disagree— today a homeowner can add on to their home without seeking the permission of a governmental entity, but tomorrow that entity can say NO—I view that as a loss of property rights). We have no reason to believe that these 150 property owners are any less informed than those in favor of the overlay. I would like to honor their request to opt out.

An amendment has been prepared to exclude these approximately 150 homes from the overlay. I plan to vote for the amendment, and then I plan to support Ginger [Hausser] and vote for the overlay . . . .

[Council member Summers at 3:02 PM, April 5, 2005]

As to the issue of taking, the courts disagree with you, not just me.

And to amend these properties out, will make the overlay useless and legally undefensible (sic). So to say you want to vote for the overlay, but opt out properties, is in reality to be opposed to the overlay and the goals it hopes to achieve. You should just vote against the overlay, because to vote to opt out the properties is the same.

[Council member Whitson at 3:54 PM, April 5, 2005]

I understand the courts' position on legal "taking". The Council has extraordinary power to change the zoning of an individual lot or to put an overlay in place. The question for me is whether the Council should exercise that power if the Government is directly taking rights from a landowner against their will. That to me is a "moral" taking, even if the courts have granted us the raw legal power. That is why I referred to it as a philosophical difference of opinion (not legal).

In my view, if we don't amend out these approximately 150 parcels, then the people will wake up with fewer rights tomorrow than they have today;

and we will have done this against their will . . . .

---

3. In an affidavit included in the record, the Information Systems Division Manager of the Metropolitan Government's ("Metro") ITS Department states that Metro could only produce the emails of the Council members who used their official Metro email address, as opposed to a personal email address, during the pertinent time period. As such, the record contains emails authored by approximately seven out of the forty Council members

[Council member Summers at 4:01 PM, April 5, 2005]

Under that argument, you should be morally prevented from every (sic) voting in support of a text change, or a downzoning, or similar large group action where anyone objections (sic) or could object if they were to know about it.

[Council member Whitson at 4:29 PM, April 5, 2005]

I hereby refuse to enter into anymore philosophical policy discussions, unless it is over alcohol. I will see you at the Council Meeting, where you can try to convince me that I am wrong for approximately 5 hours.

Immediately prior to and perhaps during the April 5 Council meeting,[4] as she was advised, Hausser utilized the Council conference room to make available to Council members the survey data collected by BHN, and a representative of BHN was present in the conference room to explain the survey and answer questions. The petitions requesting to opt out of the Overlay, as well as Hausser's survey were also in the conference room for members' review. In addition, representatives of MHZC were available to answer questions about overlays in general, and a home designer with experience building in historic overlay areas was present.

At the April 5, 2005 Council meeting, Hausser moved to pass the Overlay ordinance on third reading. Soon afterward, a motion was made to amend the Overlay ordinance to exclude the 157 residents who had filed a petition opposing the Overlay. Discussion then ensued. At the outset, in response to a question from a Council member, a representative of the MHZC informed the Council that the Metropolitan area had adopted eight neighborhood conservation zoning districts since 1985, and none had an "exclusion" provision allowing individual property owners to opt out of the restrictions. The MHZC representative noted that an "opt out" provision would make it difficult for the MHZC to administer the Overlay. A legal expert informed the Council that a conservation overlay with excluded properties could be subject to challenge after its adoption. The MHZC representative was asked a general question about the effect of conservation overlays on property values of homes in an overlay area. During the course of the Council meeting, at least eight Council members stated a range of positions. Some spoke in favor of the exclusion amendment and indicated that they could not vote for the Overlay unless it allowed property owners in the district to opt out. One Council member indicated a desire to allow property owners to opt out, but expressed concern that doing so would undercut the effectiveness of the Overlay. One did not think that the area needed the Overlay, but advocated allowing exclusions if the Overlay were adopted. Still others spoke in favor of the Overlay, arguing that even residents in conservation districts who initially opposed the restrictions later came to appreciate them. After the discussion, the exclusion amendment was de-

4. The record on the timing of the gathering in the back conference room is unclear. In response to an interrogatory, Hausser stated the following:

I do not recollect whether the conference room doors were open or closed and this may have changed *during the evening* (I was in and out of the room). I did not "invite" council members to the Council Office Conference Room *prior to the council meeting in question.* No council members were "invited" in a formal sense but council members who happened to be in the physical vicinity of me or Council member Summers were asked if they wished to see the survey data....

(emphasis added).

feated by a vote of nineteen to fifteen. Immediately thereafter, the Council adopted on third reading the ordinance to implement the Overlay in its entirety. It passed by a vote of twenty-four to eight.

On April 18, 2005, Petitioner/Appellants Joseph Johnston, Win Myint, William May and Edward Hall, all Belmont–Hillsboro residents opposed to the Overlay, filed a petition for writ of certiorari and supersedeas seeking judicial review of the MHZC's February 2005 decision. The MHZC, BHN, and Hausser were named as respondents. All three respondents filed motions to dismiss. The trial court dismissed Hausser and BHN but allowed the Appellants to amend the petition to substitute the Respondent/Appellee Metropolitan Government of Nashville and Davidson County ("Metro") as the proper respondent. The trial court ordered that the case should proceed as a writ of certiorari and indicated that discovery would be permitted upon motion after the filing of the record of proceedings before the Council.

Thereafter, on August 26, 2005, the Appellants filed an amended petition for writ of certiorari and complaint for declaratory judgment seeking review of the Council's passage of the Overlay ordinance at the April 5 meeting. The Overlay ordinance was challenged on grounds that the email correspondence and the Council conference room meeting violated Tennessee's Open Meetings Act, Tennessee Code Annotated § 8–44–101, et seq. The Appellants also argued that the enabling statute violated the separation of powers doctrine by delegating legislative authority to the MHZC, that the Overlay guidelines were unconstitutionally vague, that the Overlay amounted to a taking of their property without just compensation, that the Overlay was a product of fraud, and that the adoption of the Overlay was arbitrary and capricious and not supported by substantial and material evidence. After the record of the proceedings was filed, discovery, and discovery disputes, ensued. Eventually, a scheduling order was entered, the parties submitted briefs, and oral argument was heard on February 7, 2007.

In a memorandum opinion entered June 25, 2008, the trial court held that Tennessee Code Annotated § 13–7–401, et seq., did not allow the MHZC to exercise legislative power, that the guidelines adopted with respect to the Overlay were not unconstitutionally vague, and that application of the Overlay guidelines to property owners did not constitute an unconstitutional taking of property without just compensation. It held that the Overlay guidelines were supported by substantial and material evidence and were not arbitrary and capricious, and that adoption of the Overlay was not a product of fraud.

The trial court then considered whether the email exchanges among the Council members violated Tennessee's Open Meetings Act. It found that the email correspondence did not constitute a "meeting" under T.C.A. § 8–44–102(b)(2), but could constitute "electronic communication . . . used to . . . deliberate public business" under T.C.A. § 8–44–102(c). In analyzing the email exchanges, the trial court found:

The exchange of e-mails is noteworthy for what they do not show. There is nothing in the e-mails to indicate that a decision was reached and the later discussion on the floor of the council affirms that the council had not reached a decision on the zoning issue prior to its public vote on third reading. The e-mails do show an effort made to provide information to members of the council and, to some extent, to garner support for the overlay. While the exchange of e-mails may be considered to be deliberating toward making a decision, the ulti-

mate decision was made in accordance with the Public Meetings Act in that substantial and substantive deliberations were held and the vote on the bill conducted at the public meeting of the council. *See Neese v. Paris Special School District,* 813 S.W.2d 432 (Tenn. Ct.App.1990). While Petitioners are justifiably concerned at the appearance of a violation of the Public Meetings Act created by the e-mail exchanges (as well as the availability of information at a room adjoining the council chamber on the night of the vote on third reading, to be discussed below), it is clear that, up until the time of the actual vote, no decision had been made by members of the council and that, prior to the vote, extensive discussion was had on the floor of the counsel. Considering also the fact that the first vote taken relative to the overlay on the third reading was on the amendment to exclude properties from the historic district, the Court is of the opinion that the series of e-mail correspondence was not conducted to circumvent the requirements of the Public Meetings Act and did not constitute deliberations in violation of the Public Meetings Act.

Thus, the trial court found that the email correspondence was not conducted to circumvent the Open Meetings act and did not constitute deliberations. It also found that, even if the emails constituted deliberations, there was substantial reconsideration at the April 5, 2005 Council meeting.

The trial court also found that meeting in the Council conference room was primarily for the purpose of making information available to Council members, and did not constitute either a "meeting" or "deliberations" under the Act. Consequently, the trial court found no violation of the Open Meetings Act. The trial court therefore affirmed the Council's adoption of the Overlay and dismissed the Appellants' pe-

tition. From this order, Appellants now appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

 On appeal, Appellants present the following issues for review:

1. Whether the trial court erred in holding that the Overlay ordinance was not void as a result of violations of the Open Meetings Act, Tennessee Code Annotated § 8–44–101, *et seq.*;

2. Whether the trial court erred in holding that the enabling statute, Tennessee Code Annotated § 13–7–402, did not violate the separation of powers doctrine in Article II, Sections 1 and 2, of the Tennessee Constitution;

3. Whether the trial court erred in holding that the case should proceed as a writ of certiorari rather than as a complaint for declaratory judgment;

4. Whether the trial court erred in refusing Appellants' requests to take discovery depositions and conduct all other necessary discovery concerning violations of the Open Meetings Act;

5. Whether the trial court erred in holding that the Overlay ordinance did not violate the due process clause of the Tennessee Constitution, Article I, Section 8;

6. Whether the trial court erred in holding that the decision to establish the Overlay was not arbitrary and capricious, was supported by material evidence, and was not made upon unlawful procedure.

In certiorari proceedings, reviewing courts apply a very limited standard of review. *State ex rel. Moore & Assocs., Inc. v. West,* 246 S.W.3d 569, 574 (Tenn.Ct.App.2005). Decisions of the lower tribunal may be set aside only if the reviewing court determines "that the decision maker exceeded its jurisdiction, followed an unlawful proce-

dure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision." *Id.* (citing *Petition of Gant*, 937 S.W.2d 842, 844–45 (Tenn.1996)); *see* T.C.A. § 27–8–101 (2000). In reviewing the administrative decision, the standard of review for the trial court and for this Court is the same. *See Wright v. Tenn. Peace Officer Standards & Training Comm'n*, 277 S.W.3d 1, 8 (Tenn.Ct.App.2008) (citing *Ware v. Greene*, 984 S.W.2d 610, 614 (Tenn.Ct.App. 1998)). The trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 425 (Tenn.Ct.App.2005).

## ANALYSIS

### Open Meetings Act

The threshold issue in this case is whether there was a violation of Tennessee's Open Meetings Act in connection with the Council's enactment of the Overlay ordinance. Appellants assert that the email correspondence that took place between the March and April Council meetings, as well as the back conference room gathering on the day of the April Council meeting, constitute private deliberations prohibited by Tennessee Code Annotated § 8–44–102(c). Appellants maintain that the Council did not engage in a "new and substantial reconsideration" of the issues at the April meeting so as to cure the violation of the Act. Consequently, they contend, the Overlay ordinance should be voided because it was enacted in contravention to the Open Meetings Act.

■ Tennessee's Open Meetings Act is codified at Tennessee Code Annotated § 8–44–101, *et. seq.* The purpose provi-

sion of the Act states: "[I]t [is] to be the policy of this state that the formation of public policy and decisions is public business and shall not be conducted in secret." T.C.A. § 8–44–101(a) (2002). To effectuate this purpose, the Act provides that "[a]ll meetings of any governing body are declared to be public meetings open to the public at all times, except as provided by the Constitution of Tennessee." T.C.A. § 8–44–102(a) (2002). The term "meeting" is statutorily defined as "the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter." T.C.A. § 8–44–102(b)(2) (2002).[5] In seeking to balance the policy favoring open government against the need for efficiency in government, the Act notes that not every encounter among members of a public body will be considered a meeting, but also cautions that such other encounters are not to be used to circumvent the Act:

Nothing in this section shall be construed as to require a chance meeting of two (2) or more members of a public body to be considered a public meeting. No such chance meetings, informal assemblages, or electronic communication shall be used to decide or deliberate public business in circumvention of the spirit or requirements of this part.

T.C.A. § 8–44–102(c) (2002). The consequences of an Open Meetings Act violation are harsh: "Any action taken at a meeting in violation of this part shall be void and of no effect." T.C.A. § 8–44–105 (2002). Tennessee courts interpreting the Act, however, have recognized that its provisions should not be interpreted in such a way that, once a violation of the Open Meetings Act has occurred, the public

---

**5.** It is undisputed on appeal that the Council is a "governing body" within the meaning of

the Act. T.C.A. § 8–44–102(b)(1) (2002).

body is thereafter foreclosed from acting on the measure that was the subject of the violation:

> We do not believe that the legislative intent of this statute was forever to bar a governing body from properly ratifying its decision made in a prior violative manner. However, neither was it the legislative intent to allow such a body to ratify a decision in a subsequent meeting by a perfunctory crystallization of its earlier action. We hold that the purpose of the act is satisfied if the ultimate decision is made in accordance with the Public Meetings Act, and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue.

*Neese v. Paris Special Sch. Dist.,* 813 S.W.2d 432, 436 (Tenn.Ct.App.1990) (citations omitted). Thus, even if there has been a violation of the Act, the public body's action will not be voided if, after the violative conduct occurred, there was a "new and substantial reconsideration of the issues involved" at which the public could be present. *Id.*

■ We are mindful that the Open Meetings Act is remedial in nature and thus "should be liberally construed in furtherance of its purpose." *Neese,* 813 S.W.2d at 434; *see, e.g., State ex rel. Akin v. Town of Kingston Springs,* No. 01–A–01–9209–CH00360, 1993 WL 339305, at *2 (Tenn.Ct.App. Sept. 8, 1993) ("It should be

interpreted to promote openness and accountability in government").

### Electronic Communications

■ We consider first the substantial email communication among Council members that occurred after the second reading of the Overlay ordinance and before passage on the third and final reading. In its analysis of the email exchanges, the trial court found at the outset that the communications did not amount to a "meeting" within the meaning of the Act. We agree. Even though several emails copied all members of the Council, the exchanges among the members do not reflect either an intentional or inadvertent "convening ... for which a quorum is required" for the purpose of making a decision.[6] T.C.A. § 8–44–102(b)(2) (2002); *cf., Neese,* 813 S.W.2d at 434–35 (a majority of a local school board, enough to constitute a quorum, physically met in another state to discuss pending school board matters, and this was found to be a "meeting" under the Act).

Even if the email correspondence among the Council members is not a "meeting," Tennessee's Open Meetings Act indicates that a violation can occur if "electronic communication ... [is] used to decide or deliberate public business in circumvention of the spirit or requirements" of the Open Meetings Act.[7] T.C.A. § 8–44–102(c) (2002). As noted by the trial court, the email dialogue shows no decision as to either the Overlay or the exclusion amend-

---

**6.** We note that, after enactment of the Overlay ordinance in this case, Tennessee's Open Meetings Act was amended to specifically address "meetings" of governing bodies by means of electronic communications. *See* T.C.A. § 8–44–108 (2008). This does not, however, indicate that, prior to this amendment, there could not be a "meeting" within the meaning of the Act by means of electronic communication.

**7.** Under the open meetings statutes in some states, the analysis focuses on whether the serial communications constitute a "meeting," considering factors such as whether there was "unity of time" in the communications. *See* John F. O'Connor & Michael J. Baratz, *Some Assembly Required: The Application of State Open Meeting Laws to Email Correspondence,* 12 GEO. MASON L.REV. 719, 729–34 (Spring 2004).

ment. We look, then, at whether the emails were used to "deliberate public business" in circumvention of the Act.

In *Neese,* four of the seven total school board members accompanied the school superintendent on a trip to Kentucky to attend a "retreat." *Neese,* 813 S.W.2d at 433. While in Kentucky, the participants discussed several issues concerning the defendant school district, including a plan to "cluster" schools to correct racial and socioeconomic imbalances. *Id.* Upon returning to Tennessee, the board members discussed the clustering issue at the regularly scheduled meeting of the school board. *Id.* The board meeting included a three hour question and answer session with members of the public. *Id.* at 437. After the school board approved the clustering plan, three citizens filed a lawsuit alleging that the vote to adopt the clustering plan should be voided because the Kentucky meeting violated the Open Meetings Act. *Id.* at 433–34.

The *Neese* court recited testimony that showed that the meeting in Kentucky involved a majority of the school board, sufficient to constitute a quorum. *Id.* at 434. The court acknowledged that no decision was made in Kentucky, but then considered whether the purpose of the gathering was to "deliberate" clustering. Because the Open Meetings Act does not include a statutory definition of the term "deliberate," the Court in *Neese* looked elsewhere for a definition of "deliberate" in the context of the Act. *Id.* at 435. Citing the definition of "deliberate" in Black's Law Dictionary, the *Neese* Court explained that "[t]o deliberate is 'to examine and consult in order to form an opinion.... [T]o weigh arguments for and against a proposed course of action.'" *Id.* at 435 (quoting BLACK'S LAW DICTIONARY 384 (5th ed.1979)). The court observed, "we do not believe that the Board can successfully avoid the fact that it deliberated toward making a decision." *Id.* Thus, the *Neese* court found that a meeting for the purpose of deliberating public business, in violation of the Open Meetings Act, occurred at the "retreat" in Kentucky. *Id.*

In the case at bar, the trial court concluded that the email correspondence among Council members "was not conducted to circumvent the requirements of the ... Act and did not constitute deliberations" in violation of the Act. We agree that the email correspondence does not reflect a nefarious intent by Council members to evade the constraints of the Act. *Cf. Booth Newspapers, Inc. v. Univ. of Mich. Bd. of Regents,* 444 Mich. 211, 507 N.W.2d 422, 425 (1993) (serial telephone calls among board members were done for the admitted purpose of avoiding public deliberation on potential candidates for university president); John F. O'Connor & Michael J. Baratz, *Some Assembly Required: The Application of State Open Meeting Laws to Email Correspondence,* 12 GEO. MASON L.REV. 719, 731–32 (Spring 2004) (discussing cases of intentional circumvention). Under Tennessee's Act, however, we do not believe that such an intent to circumvent the Act is necessary to find a violation. *See, e.g., State ex rel. Akin,* 1993 WL 339305, at \*4. In *State ex rel. Akin,* the court considered a possible violation of Tennessee's Sunshine Law, the predecessor to the Open Meetings Act:

We find no evidence that the city commissioners in this case contrived to use their work sessions to circumvent the Sunshine law. Rather than acting in bad faith, they were simply following their customary way of doing business that had developed over time as a matter of convenience. The public officials' motives and intentions, however, are not controlling.

*Id.* A violation of the Open Meetings Act can occur inadvertently if the electronic communication has the effect of circumventing "the spirit or requirements" of the Act. T.C.A. § 8–44–102(c) (2002). *See* Stephen Schaeffer, Comment, *Sunshine in Cyberspace? Electronic Deliberation and the Reach of Open Meetings Laws*, 48 St. Louis U. L.J. 755, 783–84 (Winter 2004).

■ We consider, then, whether the emails constituted deliberation. Some of the emails appear to be merely the dissemination of information, as with emails from affected residents stating their position to the Council members. Some emails between individual Council members, not copied to the full Council, discussed strategy for gaining passage of the Overlay ordinance without the exclusion amendment, such as Hausser's email to fellow Council member Summers, asking "[c]an you work on Sam Coleman, Randy Foster and Tommy Bradley?" None of these emails appear to fall in the category of "deliberation"—*i.e.* "weigh[ing] arguments for and against a proposed course of action." *Neese,* 813 S.W.2d at 435 (quoting Black's Law Dictionary 384 (5th ed.1979)).[8]

In several email exchanges, however, Council members are clearly weighing arguments for and against the Overlay, with or without the exclusion amendment. These exchanges, most copied to all Council members, mirror the type of debate and reciprocal attempts at persuasion that would be expected to take place at a Council meeting, in the presence of the public and the Council as a whole. We must conclude that these emails are "electronic communication . . . used to . . . deliberate public business in circumvention of the spirit or requirements" of the Open Meetings Act. T.C.A. § 8–44–102(c) (2002).

### Back Conference Room Gathering

■ The Appellants term the April 5, 2005 gathering in the Council's back conference room a "back room meeting," and argue that deliberations must have taken place there, and therefore the "back room meeting" constituted an additional violation of the Open Meetings Act. The trial court concluded that nothing in the record showed that deliberations occurred in the Council conference room; instead, the purpose of the gathering was to make information available to Council members, especially newer members with no prior experience with historic overlays.

We agree with the holding of the trial court. Despite the Appellants' ominous characterization of the gathering as a "back room meeting," the record indicates only that the conference room was utilized to make information available to Council members. Unless the activities in the back conference room went beyond the provision of information, and extended to substantive discussion of positions and attempts to develop a consensus, then this gathering did not constitute a "meeting," did not involved "deliberation," and did not violate the Open Meetings Act. *See* John F. O'Connor & Michael J. Baratz, *Some Assembly Required: The Application of State Open Meetings Laws to Email Correspondence*, 12 Geo. Mason L.Rev. 719, 747 (Spring 2004) (citing *Wood v. Battle Ground Sch. Dist.,* 107 Wash.App. 550, 27 P.3d 1208, 1217–18 (2001)).

### New and Substantial Reconsideration

■ As noted above, in *Neese,* the Court held that even if members of a public body engage in conduct that violates

---

8. The most current version of Black's Law Dictionary defines "deliberation" as "[t]he act of carefully considering issues and options before making a decision or taking some action." Black's Law Dictionary (8th ed.2004)

the Open Meetings Act, the action of the public body will not be deemed void if, in the interim, there was a "new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue." *Neese*, 813 S.W.2d at 436. In this case, the trial court held that even if the email exchanges were considered to be deliberations in violation of the Act, "the ultimate decision was made in accordance with the ... Act in that substantial and substantive deliberations were held and the vote on the bill [was] conducted at the public meeting of the council." The trial court observed that no decision was made prior to the Council's public vote, and "prior to the vote, extensive discussion was had on the floor of the council." *Id.*

Appellants argue that the discussion at the April 5, 2005 Council meeting centered on whether an exclusion amendment to the Overlay ordinance should be adopted, permitting objecting residents to "opt out" of the Overlay. After the vote on the exclusion amendment was taken and the amendment was defeated, the Appellants point out, the vote on the Overlay itself was taken immediately. Therefore, they maintain, any "new and substantial reconsideration" occurred only with respect to the exclusion amendment and not as to the Overlay.

After reviewing the transcript of the Council's April 5, 2005 meeting, we must respectfully disagree with the Appellants' argument. A substantial part of the debate at the Council meeting was on the Overlay itself, namely, whether it was needed, how it would affect property values, and how residents in other conservation districts later felt about living with overlay restrictions. More importantly, the discussion of the exclusion amendment cannot be separated from the Overlay itself; the amendment was intended to directly affect the contours of any Overlay ordinance enacted by the Council. The fact that the vote on the Overlay took place immediately after the vote on the amendment, without any intervening discussion, is not surprising in light of the fact that the Overlay had already been a subject of discussion at two prior Council meetings and had passed on the first and second readings.

Overall, then, we agree with the holding of the trial court that there was new and substantial reconsideration of the Overlay at the Council's April 5, 2005 public meeting. Therefore, the Overlay ordinance was not adopted in contravention of the Act and is not deemed void under the terms of the Act.

### Separation of Powers

 The Appellants note that the MHZC design guidelines for the Overlay area were authorized pursuant to Tennessee Code Annotated §§ 13–7–402(d) [9] and 13–7–406,[10] and argue that the statutes

9. The statute provides the following:

(d) The permitted or prohibited property uses, the zoning procedures and other regulations otherwise applicable within a historic district or zone under the provisions of any other zoning ordinance or regulation shall apply to a historic district or zone, except when in conflict with the provisions of this part or any ordinance or regulation adopted pursuant to this part, but in the event of such conflict, the provisions of this

part and of any ordinance or regulation adopted pursuant to this part shall control. § 13–7–402(d) (2008 Supp.)

10. The statute provides the following:

Prior to the establishment of any historic district or zone, the historic zoning commission or the regional historic zoning commission also shall adopt for each such proposed district or zone a set of review guidelines, which it will apply in ruling upon the granting or denial of a certificate

provide that the design guidelines "control" any conflicting municipal ordinances. The Appellants contend that this delegation of power by the State authorizes an improper exercise of legislative power by an agency of the executive branch, and that the statutes authorizing the MHZC to adopt such design guidelines are therefore an unconstitutional violation of the separation of powers doctrine in Article II, Sections 1 and 2, of the Tennessee Constitution.

The trial court noted that, under Tennessee Code Annotated § 13–7–402(b), an historic designation may be superimposed on other districts or zones "whether established before or after the establishment of a historic district or zone." It also pointed out that, under Tennessee Code Annotated § 13–7–404, the historic districts or zones are to be established by the municipal legislative body "either as a part of a new zoning ordinance or as an amendment to existing ordinances." The trial court found that the legislative scheme did not amount to a transfer of the authority and responsibility of adopting historic zoning to the historic commission.

We agree. Under the statutory scheme, the historic zoning commission develops review guidelines and makes recommendations to the municipal legislative body; the legislative body then decides whether to adopt an ordinance establishing the historic district or zone. This statutory framework is well within the authority of the General Assembly to adopt. Indeed, the General Assembly has exceedingly broad authority to structure county and municipal governments as it sees fit. *See, e.g., Shelby County Civ. Serv. Merit Bd. v. Lively*, 692 S.W.2d 15, 18 (Tenn.1985); *County of Shelby v. McWherter*, 936 S.W.2d 923, 928 (Tenn.Ct.App.1996). As the facts in this case show, the design guidelines prepared by the MHZC are of no moment unless and until they are adopted by the enactment of an appropriate ordinance by the Metro Council. We find no violation of the separation of powers doctrine under the Tennessee Constitution.

### Writ of Certiorari

■ The Appellants contend that the trial court erred in holding that the matter should proceed as a writ of certiorari instead of a declaratory judgment action. In light of the stricter standards for discovery in certiorari actions, the Appellants were not permitted some of the discovery they sought, such as depositions of Council members and members of BHN.

Citing *Fallin v. Knox County Bd. of Comm'rs*, 656 S.W.2d 338 (Tenn.1983), the Appellants argue that the actions under review are legislative in character, rather than administrative, and so are subject to review by a declaratory judgment action rather than a writ of certiorari. However, even as a writ of certiorari, the Appellants argue, the trial court had the discretion to permit the requested discovery, and should have done so.

---

of appropriateness as provided for in this part. Such review guidelines shall be consistent with the purposes of this part and with regulations and standards adopted by the secretary of the interior pursuant to the National Historic Preservation Act of 1966, as amended, applicable to the construction, alteration, rehabilitation, relocation or demolition of any building, structure or other improvement situated within a historic district which has been certified by the secretary of the interior as a registered historic district. Reasonable public notice and opportunity for public comment, by public hearing or otherwise, shall be required before the historic zoning commission or the regional historic zoning commission adopts any such review guidelines.

T.C.A. § 13–7–406 (1999).

In response, Metro notes that the Overlay ordinance put in place a "neighborhood conservation district" as defined by Metro Code § 17.36.120, which sets forth the criteria to be used in establishing such a district. Because the Council was applying the criteria outlined in the Metro Code to create the Overlay district, Metro contends, it was performing an administrative act, reviewable by a common law writ of certiorari.[11] *See McCallen v. City of Memphis*, 786 S.W.2d 633, 639–40 (Tenn. 1990).

■ Overall, even if the matter should have proceeded as a declaratory judgment action, instead of a writ of certiorari, the ruling on the legal issues would have been similar:

> The "fairly debatable, rational basis" as applied to legislative acts, and the "illegal, arbitrary and capricious" standard relative to administrative acts are essentially the same. In either instance, the court's primary resolve is to refrain from substituting its judgment for that of the local governmental body. . . . Both legislative and administrative decisions are presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action.

*McCallen*, 786 S.W.2d at 641; *see Custom Land Dev., Inc. v. Town of Coopertown*, 168 S.W.3d 764, 771 (Tenn.Ct.App.2004) ("[C]ourts refrain from substituting their judgments for the broad discretionary power of the local governmental body."). Thus, any error by the trial court on this issue had essentially no effect on the issues before the court.

As to the trial court's discovery decisions, we review them on appeal for an abuse of discretion. *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 600 (Tenn. Ct.App.2007) (citing *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn.1992)). Even if the matter had proceeded as a declaratory judgment action, we see no abuse of discretion in the extent of discovery permitted the Appellants by the trial court.

### Due Process

Appellants maintain that they were denied their due process rights because the MHZC ignored its own rules of order and procedure, and because the recommendation by the MHZC to the Planning Commission and the Council contained no findings of fact and conclusions of law. For the same reason, the Appellants contend that the decision to adopt the Overlay ordinance was arbitrary and capricious and unsupported by substantial and material evidence.

The trial court reviewed the actions of the MHZC and the Council in determining the appropriateness of the historic overlay and the design guidelines, in gauging the degree of support for the Overlay among affected residents, and in conducting public hearings and meetings and distributing

---

11. Review of a common law writ of certiorari is normally confined to the administrative record:

> [N]ew or additional evidence may be received by the reviewing court on the issue of whether the lower tribunal exceeded its jurisdiction or in some manner acted illegally, arbitrarily, or capriciously. The petition might allege, for example, that the lower tribunal's action was based upon some ulterior motive. Obviously new evidence may be introduced on such an issue. . . .

> The situation is different, however, where the legal issue before the court is the sufficiency of the evidence to support an administrative fact-finding. On this issue no new evidence is admissible. The reviewing court is confined to the record as it existed before the lower fact-finding tribunal.

Ben H. Cantrell, *Review of Administrative Decisions by Writ of Certiorari in Tennessee*, 4 MEM. ST. L.REV. 19, 29–30 (1973).

information to inform the public and take comments. It found that the MHZC's design guidelines and the Overlay were adopted in compliance with the MHZC's rules and procedures. It found that there was substantial and material evidence to support the MHZC's recommendation to the Council, and that its actions were not arbitrary and capricious and did not violate the due process clause.

 From our review of the record, we agree with the decision of the trial court. The actions of the MHZC and the Council had a fairly debatable, rational basis,[12] were not arbitrary and capricious, were supported by substantial and material evidence, and did not violate the due process clause of the Tennessee Constitution.

### CONCLUSION

In sum, we find that the gathering that took place in the Council's back conference room did not violate Tennessee's Open Meetings Act; however, some of the email correspondence among Council members violated the Act. Nonetheless, after the exchange of emails, the Council engaged in a new and substantial reconsideration of the issues surrounding the Overlay; thus the Overlay ordinance is not deemed void under the Act. We find no violation of the separation of powers doctrine or the due process clause under the Tennessee Constitution, and no abuse of discretion in the trial court's decisions on discovery. The remainder of issues raised by the Appellants are without merit.

The decision of the trial court is reversed in part and affirmed in part. Costs of this appeal are to be assessed against Appellants Joseph H. Johnston, Win Myint, William H. May, and Edward Hall and

12. The standard of review for a declaratory judgment action. *McCallen,* 786 S.W.2d at 641.

their surety, for which execution may issue if necessary.