IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 10, 2015 Session

## FLAT IRON PARTNERS, LP, ET AL. v. THE CITY OF COVINGTON, ET AL.

Appeal from the Circuit Court for Tipton County
No. 5363     Ben H. Cantrell, Judge

---

### No. W2013-02235-COA-R3-CV – Filed April 30, 2015

---

This is an appeal from the trial court's grant of summary judgment to Appellees on their Open Meetings Act claim, and the grant of partial summary judgment to Appellees on their Fair Housing Act claims, i.e., disparate treatment and disparate impact.  We conclude that the trial court erred in granting summary judgment on the Open Meetings Act claim.  We further conclude that there are disputes of material fact that preclude the grant of partial summary judgment on the FHA claims.  Accordingly, we reverse the trial court's grant of summary judgment and vacate the trial court's entry of judgment on a jury verdict on the issue of damages.  Reversed in part, vacated in part, and remanded.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed in Part, Vacated in Part, and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

Edward J. McKenney, Jr., Memphis, Tennessee, for the appellants, City of Covington and City of Covington Municipal-Regional Planning Commission.

J. Houston Gordon, Covington, Tennessee, for the appellees, Cottonwood Associates, LLC; Cottonwood Properties, Inc.; Flat Iron Partners, LP; John Coleman Hayes, Jr.; Wilrus Company, LLC; and A. Richard Wilson.

### OPINION

### I. Background

There are two separate groups of Appellees in this case. The first group is comprised of Flat Iron Partners, LP, a Tennessee limited partnership; Wilrus Company,

LLC, a Texas limited liability company; and Richard Wilson, a Texas resident, who was the managing member of the Wilrus Company and the personal guarantor of the financial obligations of Flat Iron. We will refer to these Appellees collectively as "Flat Iron." The second group of Appellees is comprised of Cottonwood Associates, LLC, a Tennessee limited liability company; Cottonwood Properties, Inc., the general partner of Cottonwood Associates, LLC; and John Coleman Hayes, Jr., a Tennessee resident, who was the president of Cottonwood Properties, Inc. and the individual guarantor of the financial obligations of Cottonwood Properties, Inc. and Cottonwood Associates, Inc. We will refer to these Appellees collectively as "Cottonwood." We will refer to Flat Iron and Cottonwood collectively as "Appellees."

On March 20, 2000, Flat Iron purchased land in Covington, Tennessee. The purchased tract of land was zoned R-3 (High Density Residential), and Flat Iron planned to construct multi-family unit housing ("MFUH") on the land. On November 28, 2000, Cottonwood purchased two tracts of land in Covington. These tracts, which were 9.99 acres and 8.399 acres respectively, were zoned R-2 (Medium Density Residential). Like Flat Iron, Cottonwood intended to construct MFUH on these tracts.

Although the plan "was nowhere near complete," on September 5, 2000, Flat Iron was allowed to present a "conceptual plan" to the City of Covington Municipal-Regional Planning Commission (the "Commission"). As is relevant to the instant appeal, Flat Iron represented that its proposed development would not be Section 8 housing, but would be a gated community, targeting individuals making between $30,000 and $40,000 per year. Flat Iron's expert, Dr. John Gnuschke, conceded that the target tenant for both apartment projects was not considered "low income" for the City of Covington (the "City," and together with the "Commission," "Appellants").[1] At the time Flat Iron presented the conceptual plan, the City's Zoning Ordinances defined "multi-family" to include duplexes, triplexes, quadraplexes, and apartments. The City's Zoning Ordinances are liberal and would have allowed a multi-family dwelling to be built on a lot as small as 7,000 square feet. It is undisputed that Flat Iron's proposed 104-units could have been built on a tract as small at 3.58 acres. Likewise, Cottonwood could have built the proposed 217-units on a 10-acre tract, and as many as 400 apartment units could have been built on a 20-acre tract.

At a Commission meeting on October 3, 2000, several deficiencies in Flat Iron's

---

[1] In 1997, the Commission adopted the Covington Land Use and Transportation Plan, which was approved and certified by the Mayor and board of Aldermen pursuant to Tennessee Code Annotated Section 13-4-301. The City's formally adopted plan recognized the fact that vacancy rates and waiting lists for existing MFUH indicated a demand for more of these types of developments. After an analysis of census and subsequent special survey data, the plan noted that "[t]he City's median household income was 'the lowest of all municipalities in Tipton County.'"

proposed plan were noted. Of particular concern with the proposed plan was drainage. The Flat Iron property bordered a flood zone that was known to experience flooding after heavy rain. Another concern was the fact that the proposed building was adjacent to a single-family neighborhood and was close to another MFUH development (Broadmeadow). Also of concern were: (1) the fact that the proposed plan did not satisfy the setback requirements of the City's subdivision regulations; the fact that the buildings were too close together; and (3) the fact that the streets within the proposed complex were not wide enough to allow a fire truck to turn around.

By the November 14, 2000 Commission meeting, Flat Iron still had not addressed all of the site plan concerns. Accordingly, the decision regarding the site plan was deferred until the December 5, 2000 meeting. However, on November 27, 2000, the City's Board of Mayor and Aldermen ("BMA") met with the City's attorney. The purpose of the meeting was informational—to advise the BMA members that a Resolution would be presented at the November 28, 2000 Commission meeting to impose a temporary moratorium on the issuance of building permits. Specifically, the temporary moratorium would impose a moratorium on the issuance of building permits until July 1, 2001. No vote was taken at the November 27 meeting, nor was there any decision or deliberation as to how any BMA member would vote.

On November 28, 2000, at the regularly scheduled Commission meeting, the Moratorium Resolution was presented to the BMA. After extensive public debate, during which members of the public were allowed to comment (including Mr. Johnny Howard, who spoke on behalf of Flat Iron), a public vote was taken, and the Moratorium Resolution was adopted. The BMA also adopted, on first reading, an Ordinance amending the Zoning Ordinances to impose the temporary moratorium until July 1, 2001 on the issuance of any building permits.

Special called meetings of the BMA, for which notices were given, were held on November 29 and November 30, 2000 to consider the moratorium resolution. There was public debate at both meetings, and spokespersons, on behalf of Flat Iron, were allowed to speak in opposition to the moratorium. Following a vote, the BMA adopted an Ordinance amending the Zoning Ordinance to impose the temporary moratorium upon the issuance of building permits.

On December 5, 2000, Flat Iron's lawyer, Michael Acree, appeared before the Commission and advised it that Flat Iron was amenable to comply with any amendments that might be made to the Zoning Ordinance so long as the Commission would approve Flat Iron's preliminary site plan.

In mid-January, 2001, Flat Iron requested a building permit. It is undisputed that Flat Iron had presented only a preliminary site plan at this time. Specifically, it had not submitted its building plans, had not completed its grading plans, drainage plans, water and sewer plans, or construction plans, and it had not submitted a final site plan for approval. Accordingly, its request for a building permit was denied at that time.[2]

On January 31, 2001, Flat Iron and Cottonwood filed suit against the Appellants.[3] Appellees' claims included: (1) a mandamus claim ordering the City to immediately issue building permits to Appellees; (2) issuance of a writ of certiorari under Tennessee Code Annotated Section 27-8-101 and a finding that the zoning amendments were illegal, unconstitutional, confiscatory, arbitrary and unreasonable; (3) a takings claim under federal law; (4) a State inverse condemnation claim under Tennessee Code Annotated Section 29-16-123; (5) a claim for violation of Tennessee Code Annotated Section 13-3-402, *et seq.*; (6) a claim for violation of State zoning statutes, Tennessee Code Annotated Section 13-2-401, *et seq.*; (7) a claim that the challenged actions were retrospective laws in violation of Art. I, § 20 of the Tennessee Constitution; (8) an Open Meetings Act claim pursuant to Tennessee Code Annotated Section 8-44-101, *et seq.*; (9) a claim for violation of Appellees' substantive and procedural due process rights; (10) a Section 1983 claim; (11) a Fair Housing Act ("FHA") violation claim; and (12) a declaratory judgment action. On February 14, 2001, Appellees filed a motion for preliminary injunction and partial summary judgment.

On August 15, 2001, the trial court granted in part and denied in part Appellees' motion. The trial court granted summary judgment to Appellees on the Open Meetings claim based upon its finding that no notice was given of the attorney-client meeting on November 27, 2000. Accordingly, the court reasoned that the subsequent actions taken at the public meetings on November 28 and 30, 2000 meetings were "null and void." The trial court also found that the ordinance imposing a temporary moratorium on the issuance of building permits until July 1, 2001 violated the provisions of Tennessee Code Annotated Section 13-7-203, which requires that zoning amendments be approved by the Commission and published in a newspaper fifteen days prior to adoption. The court denied Appellees' request for equitable relief requiring the City to approve Flat Iron's site plan as it existed before the amendment. Specifically, the court found that "Flat Iron must conform to any timely amendments, and is required to get a preliminary plan approved." The court subsequently reaffirmed, in its April 1, 2009 order, that it had

---

[2] The City granted Flat Iron building permits on April 22, 2002. Thereafter, Flat Iron built 104 units. The City granted Cottonwood certificates of occupancy for Phase I in November 2002 and for Phase II in April 2003.

[3] Appellees filed an amended complaint on September 8, 2004 to add the Planning Commission and members of the Planning Commission as parties. The substantive claims were not amended.

"determined that the new ordinances passed in June 2001 must be complied with for a building permit to issue to [Appellees]."

The parties then filed cross motions for summary judgment. Appellees filed their motion on or about June 16, 2005; Appellants filed their motion on August 1, 2006. On April 1, 2009, the trial court ruled on these motions.[4] With respect to the FHA claims, the trial court denied Appellants' motion for summary judgment, stating that there were "contested issues of fact." As to Appellees' motion, the trial court also found that "there are contested issues of fact;" nonetheless, the court granted partial summary judgment to Appellees because it found that Appellees "have established a prima facie case of discriminatory intent and are entitled to summary judgment on the issue of liability under the Fair Housing Act as a matter of law." The court also found that Appellees "have shown facts to establish a prima facie case of disparate impact," and, thus, "were entitled to summary judgment."

Appellants then filed a motion for interlocutory appeal on May 1, 2009. The motion was denied by the trial court on April 6, 2011 in an order, which, again, noted that the trial court had found that "there are contested issues of fact for determination by the trier of fact" with respect to Appellees' FHA claim. Appellants then filed a Tennessee Rule of Appellate Procedure 10 appeal on April 25, 2011; the application was denied on May 6, 2011. Following additional discovery, Appellants filed a motion to revise the trial court's ruling on the FHA claim. The case was set for trial on August 20, 2012. On August 14, 2012, the trial judge issued an order recusing himself. The case was then assigned to Senior Judge Ben H. Cantrell, who denied Appellants' motion to revise the FHA ruling. Appellants' motion to revise the Open Meetings Act ruling was also denied by order of January 13, 2013.

The case was tried to a jury beginning on February 5, 2013. The sole issue was the amount of damages on Appellees' FHA claim. At the beginning of the trial, the trial court denied Appellants' renewed motion to reconsider the summary judgment rulings and denied Appellants' motion to be allowed to present evidence as to the reasons for the challenged actions. The court reasoned that the initial trial judge had already determined that issue. Likewise, the trial court denied Appellants' motion in limine to exclude evidence or argument to the jury that the moratorium ordinance was "illegal" or "unlawful" or anything more than a violation of Tennessee Code Annotated Section 8-44-102 and 103 or Tennessee Code Annotated Sections 13-7-203 and 204.

On February 15, 2014, the jury returned a verdict in favor of Flat Iron in the amount of $1,201,095 and in favor of Cottonwood in the amount of $4,551,835. As to

---

[4] There is no explanation in the record for the time between the filing of the motions for summary judgment and the trial court's ruling on the motions.

both Appellees, the jury found that they had suffered damages as a result of the actions of the City, but found that Appellees had suffered no damages as a result of the actions of the Commission. The trial court entered judgment on the jury verdict on March 21, 2013. On April 19, 2014, Appellants filed a motion for judgment notwithstanding the verdict, for new trial, or, in the alternative, for remittitur. By order of September 3, 2013, the trial court denied the motion for judgment notwithstanding the verdict, denied the motion for new trial, denied the motion for remittitur as to Flat Iron, but granted remittitur as to the Cottonwood verdict, reducing its judgment to $2,983,744. Cottonwood accepted the remittur under protest on September 3, 2013.

## II. Issues

Appellants appeal. They raise seven issues for review as stated in their brief:

1. Whether the trial court erred in ruling that [Appellees] were entitled to summary judgment on their Open Meeting Act claim based upon its finding that there was no notice given of an attorney-client meeting on November 27, 2000, when Flat Iron lacked standing to assert an Open Meetings claim and the pending ordinance doctrine made the moratorium issue irrelevant as to Cottonwood, and when it was undisputed that no decision was made nor was their deliberation towards a decision at that meeting; that the termporary moratorium on the issue of building permits for multi-family housing was debated in three subsequent public meetings on November 28-30, 2000, at which the public was allowed to speak reagarding the moratorium; and that a public vote was taken on November 30, 2000, which had the legal effect of curing any Open Meetings Act violation?

2. Whether the trial court erred in ruling that [Appellees] were entitled to summary judgment on their claim of disparate treatment under the Fair Housing Act and denying [Appellants'] motion for summary judgment and their motions to revise and reconsider based upon its finding that [Appellees] had established a prima facie case, despite finding that there were disputed issues of fact; when [Appellees] lacked standing to assert a Fair Housing Act claim; when [Appellants] came forward with sworn testimony not only denying discriminatory intent but setting forth legitimate, non-discriminatory reasons for their actions; when there was no evidence that the moratorium or new density regulations were adopted because of the FHA-protected status of [Appellees'] prospective tenants; and when the trial court failed to utilize the applicable burden-shifting principles?

6

3. Whether the trial court erred in ruling that [Appellees] were entitled to summary judgment on their claim of disparate impact under the Fair Housing Act and denying [Appellants'] motion for summary judgment and their motions to revise and to reconsider based upon its finding that [Appellees] had established a prima facie case, despite finding that there were disputed issues of fact; when [Appellees] did not allege a disparate impact claim in their complaint or amended complaint; when the express language of the Fair Housing Act does not include "effects" language and the Supreme Court has never recognized such a claim; when Plaintiffs lacked standing to assert a FHA claim; when [Appellees] failed to prove that the moratorium and new density regulations had a significant disparate impact upon the FHA-protected classes as compared with non-FHA-protected classes; when there was no evidence that the moratorium and new density regulations were adopted because of the FHA-protected status of [Appellees'] prosepective tenants; and when the trial court failed to utilize the applicable burden-shifting principles?

4. Whether the trial court erred in allowing improper arguments to be made by counsel for [Appellees'] in the presence of the jury which made it impossible for [Appellants] to get a fair trial?

5. Whether the trial court erred in making comments in the presence of the jury which were prejudicial to [Appellants]?

6. Whether the jury verdicts are inconsistent?

7. Whether the jury instructions given by the trial court did not fairly define the legal issues involved and misled the jury?

### III. Standard of Review

Summary judgment is appropriate when a party establishes that there is no genuine issue as to any material fact and that a judgment may be rendered as a matter of law. Tenn. R. Civ. P. 56.04; **Stovall v. Clarke**, 113 S.W.3d 715, 721 (Tenn. 2003). It is appropriate in virtually all civil cases that can be resolved on the basis of legal issues alone. **Byrd v. Hall**, 847 S.W.2d 208, 210 (Tenn. 1993); **Pendleton v. Mills**, 73 S.W.3d 115, 121 (Tenn.Ct.App.2001). It is not appropriate when genuine disputes regarding material facts exist. *See* Tenn. R. Civ. P. 56.04. The party seeking summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that the party is entitled to judgment as a matter of law. **Godfrey v. Ruiz**, 90 S.W.3d 692, 695 (Tenn. 2002). To be entitled to summary judgment, the moving party must affirmatively

7

negate an essential element of the nonmoving party's claim or show that the moving party cannot prove an essential element of the claim at trial. ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 83 (Tenn. 2008).

Summary judgments do not enjoy a presumption of correctness on appeal. ***BellSouth Adver. & Publ'g Co. v. Johnson***, 100 S.W.3d 202, 205 (Tenn. 2003). Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment *de novo* with no presumption of correctness. ***Martin v. Norfolk Southern Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008) The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. ***Hunter v. Brown***, 955 S .W.2d 49, 50–51 (Tenn. 1977). As does the trial court, the appellate court considers the evidence in the light most favorable to the nonmoving party and resolves all inferences in that party's favor. ***Martin***, 271 S.W.3d at 84; ***Stovall v. Clarke***, 113 S.W.3d 715, 721 (Tenn. 2003); ***Godfrey v. Ruiz***, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, the appellate court first determines whether factual disputes exist. If a factual dispute exists, the court then determines whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993).

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. A properly supported motion for summary judgment must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. ***Staples v. CBL & Assocs., Inc***., 15 S.W.3d 83, 88 (Tenn. 2000); ***McCarley v. W. Quality Food Serv***., 960 S.W.2d 585, 588 (Tenn. 1998). If the moving party makes a properly supported motion, then the nonmoving party is required to establish the existence of the essential elements of the claim. ***McCarley***, 960 S.W.2d at 588; ***Byrd***, 847 S.W.2d at 215. If, however, the moving party does not properly support the motion, then the nonmoving party's burden to produce either supporting affidavits or discovery is relieved and the motion must fail. ***McCarley***, 960 S.W.2d at 588; ***Martin***, 271 S.W.3d at 83.

To make this showing and shift the burden of production, a moving party may: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. ***Martin***, 271 S .W.3d at 83; ***Hannan v. Alltel Publ'g Co***., 270 S.W.3d 1, 5 (Tenn. 2008); ***Byrd***, 847 S.W.2d at 215 n. 5. Whichever approach the moving party takes, both require more than assertions of the nonmoving party's lack of evidence. ***Martin***, 271 S.W.3d at 83-84. In addition, the moving party must present evidence that more than "raises doubts" about

the ability of the nonmoving party to prove its claim at trial. *Id*. at 84. The moving party must produce evidence or refer to previously submitted evidence. *Id*.; *accord **Hannan***, 270 S.W.3d at 5. Thus, to negate an essential element of a claim, a moving party must refer to evidence that tends to disprove an essential element of the claim made by the nonmoving party. ***Martin***, 271 S.W.3d at 84.[5] As stated by this court in ***Evco Corp. v. Ross***, 528 S.W.2d 20, 25 (Tenn. 1975):

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon *25 issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

## IV. Analysis

### A. Open Meetings Act

Tennessee's Open Meetings Act is codified at Tennessee Code Annotated Section 8-44-101, *et seq*. The purpose provision of the Act states: "[I]t [is] to be the policy of this state that the formation of public policy and decisions is public business and shall not be conducted in secret." Tenn. Code Ann. § 8-44-101(a). To effectuate this purpose, the Act provides that "[a]ll meetings of any governing body are declared to be public meetings open to the public at all times, except as provided by the Constitution of Tennessee." Tenn. Code Ann. § 8-44-102(a) (2002). The term "meeting" is statutorily defined as "the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter." Tenn. Code Ann. § 8-44-102(b)(2) (2002). In seeking to balance the policy favoring open government against the need for efficiency in government, the Act notes that not every encounter among members of a public body will be considered a meeting, but also cautions that such other encounters are not to be used to circumvent the Act:

---

[5] Tennessee Code Annotated § 20-16-101 (2011), a provision enacted to replace the summary judgment standard adopted in ***Hannan v. Alltel Publ'g Co***., 270 S.W.3d 1, 8-9 (Tenn.2008), is inapplicable to this case because this case was filed before July 1, 2011. *See **Sykes v. Chattanooga Hous. Auth**.*, 343 S.W.3d 18, 25 n. 2 (Tenn. 2011) (noting that section 20-16-101 is only applicable to actions filed on or after July 1, 2011).

Nothing in this section shall be construed as to require a chance meeting of two (2) or more members of a public body to be considered a public meeting. No such chance meetings, informal assemblages, or electronic communication shall be used to decide or deliberate public business in circumvention of the spirit or requirements of this part.

Tenn. Code Ann. § 8-44-102(c). The consequences of an Open Meetings Act violation are harsh: "Any action taken at a meeting in violation of this part shall be void and of no effect." T.C.A. § 8-44-105. Tennessee courts interpreting the Act, however, have recognized that its provisions should not be interpreted in such a way that, once a violation of the Open Meetings Act has occurred, the public body is thereafter foreclosed from acting on the measure that was the subject of the violation:

We do not believe that the legislative intent of this statute was forever to bar a governing body from properly ratifying its decision made in a prior violative manner. However, neither was it the legislative intent to allow such a body to ratify a decision in a subsequent meeting by a perfunctory crystallization of its earlier action. We hold that the purpose of the act is satisfied if the ultimate decision is made in accordance with the Public Meetings Act, and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue.

*Neese v. Paris Special Sch. Dist.*, 813 S.W.2d 432, 436 (Tenn. Ct. App.1990) (citations omitted). Thus, even if there has been a violation of the Act, the public body's action will not be voided if, after the violative conduct occurred, there was a "new and substantial reconsideration of the issues involved" at which the public could be present. *Id.*

In their motion for summary judgment, Appellees argued that the Appellants violated the foregoing statutory provisions by holding a private meeting of the BMA on November 27, 2000. In its August 15, 2001 order on the motion the trial court held, in pertinent part, that:

The purpose of the November 27, 2000 meeting was to allow the Mayor and Board of Aldermen to discuss and to consider the action of amending the zoning ordinance concerning the imposition of a moratorium to stop any multi-family development in the City of Covington. As indicated by Alderman Phelps, the specific purpose of the meeting was made known and it was explained why specific action to be taken would be taken. The actions that resulted from this private meeting violated the Open Meeting[s]

10

Statute.  Failure to comply with the notice requirements make the ordinance invalid.

Turning to the record, after Appellees filed their motion for summary judgment on the issue of the Open Meetings Act violation, Appellants countered with sworn deposition testimony of Mr. Keith Phelps, who was on the Board of Alderman on November 27, 2000.  In relevant part, Mr. Phelps testfied that the purpose of the November 27, 2000 meeting  was "[t]o introduce the idea or proposing a moratorium on multifamily housing the following night."  When asked whethere there was "discussion among the board members who were there about who would support [the moratorium] and who would not support it," Mr. Phelps answered, "[n]ot that I recall.  I mean, I guess there were positive and negative comments made, but no one—there was nothing such as who will vote, you know, and how will you vote . . . ."  In *Johnston v. Metro Gov't of Nashville and Davidson County*, 320 S.W.3d 299 (Tenn. Ct. App. 2009), this Court held that there was no violation of the Open Meetings Act where members of the Nashville Metropolitan Council held a meeting to dissiminate information prior to a public meeting on a zoning issue, to wit:

> The Appellants term the April 5, 2005 gathering in the Council's back conference room a "back room meeting," and argue that deliberations must have taken place there, and therefore the "back room meeting" constituted an additional violation of the Open Meetings Act. The trial court concluded that nothing in the record showed that deliberations occurred in the Council conference room; instead, the purpose of the gathering was to make information available to Council members, especially newer members with no prior experience with historic overlays.
>
> We agree with the holding of the trial court. Despite the Appellants' ominous characterization of the gathering as a "back room meeting," the record indicates only that the conference room was utilized to make information available to Council members. Unless the activities in the back conference room went beyond the provision of information, and extended to substantive discussion of positions and attempts to develop a consensus, then this gathering did not constitute a "meeting," did not involve "deliberation," and did not violate the Open Meetings Act. *See* John F. O'Connor & Michael J. Baratz, *Some Assembly Required: The Application of State Open Meetings Laws to Email Correspondence*, 12 Geo. Mason L. Rev. 719, 747 (Spring 2004) (citing *Wood v. Battle Ground Sch. Dist.*, 107 Wash. App. 550, 27 P.3d 1208, 1217–18 (2001)).

*Johnston*, 320 S.W.3d at 312.  As set out in the Standard of Review section above, in

ruling on the motion for summary judgment, the trial court was required to take Appellants' proof as true and to give all reasonable inference in favor of Appellants as the non-moving parties. Accordingly, taking Mr. Phelps' sworn statements as true, the November 27, 2000 meeting is similar to the meeting at issue in *Johnston* in that Mr. Phelps stated that there was no vote or deliberation at the meeting; rather, Mr. Phelps stated that the purpose of the meeting was to introduce the proposed moratorium, and to make relevant information available. As in *Johnston,* there is no indication that the activities at the November 27, 2000 meeting "went beyond the provision of information, and extended to substantive discussion of positions and attempts to develop a consensus." In this regard, the November 27, 2000 gathering did not constitute a "meeting" under the Open Meetings Act.

In addition, as noted above, in *Neese*, the Court held that even if members of a public body engage in conduct that violates the Open Meetings Act, the action of the public body will not be deemed void if, in the interim, there was a "new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue." *Neese*, 813 S.W.2d at 436. In *Johnston*, for example, the trial court held that even if the Council's activities were considered to be deliberations in violation of the Act, "the ultimate decision was made in accordance with the ... Act in that substantial and substantive deliberations were held and the vote on the bill [was] conducted at the public meeting of the council." The trial court observed that no decision was made prior to the Council's public vote, and "prior to the vote, extensive discussion was had on the floor of the council." *Id*. Likewise, in the instant case, there is no dispute that the vote on the proposed moratorium was held after subsequent meetings on November 28, 29, and 30, 2000, for which notice was given and at which members of the public spoke and debated. Under the holding in *Neese*, therefore, we conclude that, even assuming *arguendo* that deliberations occurred at the November 27, 2000 meeting in violation of the Act, such violation was cured by the subsequent meetings where the BMA fully and fairly considered the proposed moratorium ordinances. As stated in *Neese*:

> We do not believe that the legislative intent of this statute [Tennessee Code Annotated Section § 8-44-105] was forever to bar a governing body from properly ratifying its decision made in a prior violative manner. However, neither was it the legislative intent to allow such a body to ratify a decision in a subsequent meeting by a perfunctory crystallization of its earlier action. We hold that the purpose of the act is satisfied if the ultimate decision is made in accordance with the Public Meetings Act, and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue.

12

*Neese*, 813 S.W.2d at 436 (internal citation omitted).

Based upon our conclusion that, under the holdings of ***Johnston*** and ***Neese***, there was no Open Meetings Act violation in this case, we reverse the trial court's grant of summary judgment in favor of Appellees on this issue.

## B.  Disparate Treatment Claim

To establish a disparate treatment claim under the FHA, Appellees must prove that a discriminatory purpose was a motivating factor in the Appellants' actions.  In other words, Appellants have the burden to prove that housing was made unavailable to FHA-protected persons **because** of race, religion, sex, familial status, national origin, or disability.  42 U.S.C. § 3604(a) and (c) (emphasis added); *see also* ***Spann v. Abraham***, 36 S.W.3d 452, 463 (Tenn. Ct. App. 1999) (holding that, in order to prevail on a disparate treatment claim involving pregnancy discrimination, the plaintiff must prove that she was treated differently than other temporarily disabled employees **because** of her pregnancy) (emphasis added)).

To establish a prima facie case for disparate treatment where plaintiffs are not members of a protected class, they must show that: (1) they contracted with members of a class protected by the FHA; (2) those persons sought and were qualified to rent the housing in question; (3) defendants "otherwise made unavailable" or refused to allow those persons to rent the housing because of their FHA-protected status; and (4) housing opportunities remained available to other renters outside the FHA-protected categories. ***Lynn v. Village of Pomana***, 373 F. Supp.2d 418, 428-29 (S.D. N.Y. 2005).

When analyzing evidence of intentional discrimination in FHA cases, the three-part burden-of-proof test developed in ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792 (1973) and ***Texas Dep't of Comm. Affairs v. Burdine***, 450 U.S. 248 (1981) is applicable. ***Maki v. Laako***, 88 F.3d 361, 364 (6th Cir. 1996); ***Selden Apts. V. U.S. Dept. of Hous. and Urban Dev.***, 785 F.2d 152, 159 (1986).  Under this framework, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. "Establishing a prima facie case of discrimination creates a rebuttable presumption that the [defendant] unlawfully discriminated against the [plaintiff]." ***St. Mary's Honor Ctr. v. Hicks***, 509 U.S. 502, 506 (1993).  If the plaintiff satisfies this burden, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. ***McDonnell-Douglas***, 411 U.S. at 802); *see also* ***Wards Cove Packing Co. v.*** Atonio, 490 U.S. 642 (1989); ***Lindsay v.*** Yates, 578 F.2d 407, 421 (6th Cir. 2009).  The defendant's burden is simply a burden of production, not persuasion. ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 142 (2000);

*Wilson v. Rubin*, 104 S.W.3d 39, 50 (Tenn. Ct. App. 2002); *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 652 (Tenn. Ct. App. 2001). The defendant is not required to persuade the court that it "was actually motivated by the proferred reasons, and there is no credibility assessment at this point of the analysis." *St Mary's*, 509 U.S. at 510. "[B]y producing evidence of a non-discriminatory reason, persuasive or not, defendant meets its burden of production." *Davis v. Reliance Elec*, 104 S.W.3d 57, 62 (Tenn. Ct. App. 2002). Even if the court ultimately rejects the defendant's proffered reason, that does not compel a judgment for the plaintiff. *Reeves*, 530 U.S. at 146.

If the defendant carries its burden of production, "the presumption of discrimination [created by the establishment of a prima facie case] drops out of the picture." *St. Mary's*, 509 U.S. at 511; *Wilson*, 104 S.W.3d at 50; *Moore*, 72 S.W.3d at 652; *Spann*, 36 S.W.3d at 465. The burden of persuasion then shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons proferred by the defendant were not the true reasons for its action, but were merely pretext and that the true reason was discrimination because of the FHA-protected status of the plaintiff's prospective tenants. *Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008); *Wilson*, 104 S.W.3d at 50; *Moore*, 72 S.W.3d at 652.

With the foregoing principles in mind, we turn to the record. In support of their motion for partial summary judgment on the disparate treatment claim, Appellees claimed that the undisputed facts showed that the Appellants, acting through the BMA, passed an illegal and void amendment to the City's general ordinance for the specific purpose of, first, stopping Appellees from building high-density, MFUH developments in Covington. Furthermore, Appellees asserted that the undisputed facts showed an express intent on the part of Appellants to prevent any more "low income," "Section 8," high-density, MFUH from being built in Covington. According to Appellees, the foregoing actions were taken despite the City's 1997 Land Use and Transportation Plan, in which the City had officially made findings of rampant poverty and of the severe need for such housing. In 1997, the City had adopted an overarching policy that it "should encourage high density housing development." However, according to Appellees' statement of undisputed facts, no low-income housing had, in fact, been built in Covington between 1997 and November 2000. Under the *McDonnell-Douglas* framework, Appellees arguably met their initial burden to state a prima facie case for disparate treatment.[6] The burden (of production), then shifted to Appellants to show a non-discriminatory reason for its action in passing the amended zoning ordinance.

Appellants filed the affidavit of the former Mayor of Covington, Russell Bailey, in opposition to Appellees' motion for partial summary judgment. In relevant part, Mr.

---

[6] The trial court is not precluded from revisiting the issue of whether Appellees established a prima facie case for disparate treatment on remand.

Bailey testified that the City "had no intention nor desire to discriminate against either [Appellee] in the lawsuit nor to any class of persons. We had to come up with an overall plan for multi-family housing and had started before either project was brought up." Furthermore, former City of Covington Alderman, Shelvie Ross, stated in his deposition, which was offered by Appellants in opposition to the motion for summary judgment, that "I had no intent to discriminate against Flat Iron or Cottonwood or multi-family unit housing for low income residents. My vote in favor of the moratorium ordinance and for new zoning density regulations was to ensure that Covington citizens, particularly those who moved into Flat Iron and Cottonwood, would live in a high quality, not crowded, beautiful space." Other former aldermen testified along similar lines. In addition, Commission Chairman Joe Swaim provided a sworn affidavit, stating that

> [i]n 2000-2001, all Planning Commission members and I recognized that Covington's multi-family regulations, particularly regarding density, were insufficient and that the Planning Commission needed to address them. We believed that Covington had a pattern of multi-family development that needed to be discontinued. The moratorium passed in 2000 gave the Planning Commission approximately six months to complete a study of multi-family unit housing and density and to make a recommendation to the City Board. We used our time well, studied the issues, reviewed different proposed changes and recommended new density regulations that we believed were fair and reasonable.

From the record, Appellants provided ample evidence to rebut the presumption of discriminatory treatment by providing legitimate, non-discriminatory reasons for their actions. At the summary judgment stage, the trial court was required to take this countervailing evidence as true. It does not, however, appear that the trial court did so. Here, contrary to the foregoing evidence, the trial court found that the City had not reviewed MFUH density, either before or after the moratorium. The testimony of Chairman Swaim, the former mayor, and the aldermen directly contradicts the trial court's finding and creates a factual issue as to the true reason for the challenged action. "At the summary judgment phase, if the plaintiff succeeds in making the [defendant's] stated non-discriminatory reason a disputed fact, then it is up to the fact-finder to resolve the factual dispute as well as the ultimate question—whether the [defendant] discriminated against the [plaintiff]." *Frame v. Davidson Transit Org.*, 194 S.W.3d 429, 438 (Tenn. Ct. App. 2005); *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 203 (Tenn. Ct. App. 1999). For this reason, the trial court erred in granting partial summary judgment on the Appellees' disparate treatment claim.

15

## C. Disparate Impact Claim

As it did with Appellees' disparate treatment claim, the trial court also found that Appellees "have shown facts to establish a prima facie case of disparate impact." Based on this finding, the trial court granted Appellees' motion for summary judgment on this claim.

As noted in 2 Arden H. Rathkopf, and Daren A. Rathkopf, Edward H. Ziegler, Jr., Rathkopf's The Law of Zoning and Planning § 25:22 (4th ed. 2015):

> A violation of the Fair Housing Act's provisions with respect to discrimination in housing may be shown by either discriminatory intent (disparate treatment) or disparate impact or effect. The U.S. Supreme Court has not addressed the issue of what test or standard to apply in disparate impact cases under the Fair Housing Act. Lower courts, however, generally have held that a claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination. Indeed, "the necessary premise of the disparate impact approach is that some [housing] practices adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."
>
> In applying disparate impact analysis under the Fair Housing Act, courts may consider:
> (1) the strength of the plaintiff's showing of discriminatory impact;
> (2) evidence of discriminatory intent;
> (3) the defendant's interest in taking the action complained of; and
> (4) whether plaintiff seeks to compel the defendant to provide housing affirmatively or merely to restrain the defendant from interfering with private provision of housing.
>
> Not every showing of discriminatory impact will be held to constitute a violation of the Act. The strength of the showing of disparate impact may be rebutted or outweighed by the defendant's legitimate interest in taking the action complained of.

*Id*. (footnotes omitted).[7]

---

[7] Aside from their substantive argument, Appellants also assert that Appellees did not make a claim for disparate impact in their amended complaint. Appellants also argue that there is not a disparate impact cause of action in FHA-violation claims and further claim that Appellees may not have standing to assert a claim under the FHA. Because we conclude that there are disputed material facts that preclude summary judgment on all of Appellees' claims, we will not address these issues in this opinion.

Appellees' disparate impact claim is based, in part, on the testimony of their expert, John Gnuschke, an economist, and Mike Ritz, a businessman with some experience in real estate development and financing. Messrs. Gnuschke and Ritz opined that Appellants' action "adversely impacted" protected classes. Specifically, Mr. Gnchke Gnuschke's affidavit states that the moritorium "reduced the supply of affordable housing and adversely impacted minorities, low and moderate income residents, families with children, female headed families with children, [and] female non-family households." Mr. Gnuschke made the following statements in his analysis, which was attached as Exhibit B to his affidavit:

1. Any action on the part of the community that reduces the supply of housing will also reduce the availability of affordable housing units for low-income residents

2. Through the process of filtering, the supply of bottom-quality housing is dependent on new housing construction at all levels, not just newly built "affordable housing."

3. Metropolitan area growth in the quantity of low-quality housing units is quite sensitive to the quantity of new, higher-quality housing supplied.

4. To the extent that the cities make it difficult to build new housing, any type of new housing, the availability of low-cost housing will be reduced and the affordability of all housing will decline.

5. Poor people tend to fill properties left behind by more mobile, higher-income residents that fill higher quality single and multi-family properties.

6. Because the rents under consideration at the time [by Appellees] were slightly higher than those allowed by HUD under the Section 8 program, it was assumed that the [Appellees'] property would not be available to Section 8 renters.

Likewise, Mr. Ritz's affidavit stated that the Appellants' actions "discriminated against and adversely impacted Black/African Americans, low and moderate income residents, families with children, female headed families with children, female non-family households and handicapped citzens."[8]

However, our holding does not preclude Appellants from raising these issues in the trial court on remand.

[8] Appellants argue that the legal conclusions offered by the Appellees' experts "do not constitute such facts as would be admissible in evidence." *Wadlington v. Miles, Inc.*, 922 S.W.2d 526 (Tenn. Ct. App.

In cross-examining Mr. Gnuschke in his deposition, which was filed in support of the motion for partial summary judgment, Appellants created disputes of fact concerning Mr. Gnuschke's analysis and conclusions:

> Q [to Mr. Gnuschke]: Has anyone suggested at any time that Covington did anything to try to preclude female heads of household from moving into any apartment in Covington?
>
> A.  No.
>
> Q.  Has anyone at any time told you that Covington had done anything to preclude African Americans from moving into any apartment in Covington?
>
> A.  No, sir.
>
> *               *               *
>
> Q.  And . . . you've seen nothing that would document that there was an impact that was significantly different for African Americans because of the moratorium, than on non-African Americans?
>
> A.  . . . I have not seen who's occupying the Flat Iron project and who's occupying the Cottonwood project.  No.
>
> *               *               *
>
> Q.  You can't identify any female head of household that was looking to rent during that period of time that was not allowed to do so?
>
> A.  No, sir.

In addition to creating a dispute of fact concerning the actual existence of any disparate

---

1995).  Accordingly, Appellants contend that the trial court "committed reversible error in failing to determine the admissibility of [Appellees'] experts' reports and affidavits and by considering such inadmissible, conclusory legal opinions in its determination of the parties' motions for summary judgment because such opinions are insufficient to create a genuine issue." *Shipley  v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011); *Ward v. City of Lebanon*, 273 S.W.3d 628, 636 (Tenn. Ct. App. 2008); *Dempsey v. Correct Manuf. Corp.*, 755 S.W.2d 798, 806-807 (Tenn. Ct. App. 1988).  Our disposition of this appeal is based upon the dispute of material fact; however, our holding does not preclude Appellants from raising these issues on remand.

impact, Appellants also created factual disputes concerning the validity of Mr. Gnuschke's research methods:

> Q. The opinions you've reached in this case didn't result from any independent research done by you unrelated to this lawsuit, though?
>
> A. No.
>
> Q. Your opinions are directly related to what you've been asked to testify to in this case?
>
> A. Yes.
>
> Q. With respect to a white person who might have wanted to rent property in Covington in 2001, the moratorium would have the same impact on a white person as it would for an African American, wouldn't it? If any delay for Flat Iron to build, if a white person was looking to rent, it would have the same impact on that white person that it would on an African American?
>
> A. Didn't, didn't distinguish between African Americans and non-African Americans.
>
> Q. So the impact would be the same?
>
> A. Yes.

Likewise, Appellants created dispute as to whether Mr. Ritz's opinion was based on proper methodology:

> Q [to Mr. Ritz]: Is there any peer review information that you're aware of that would be helpful in testing your methodology?
>
> A. I don't know.
>
> Q. Is there any publication or treatise that you would consider authoritative that would provide support for your methodology in reaching [your] conclusion [of disparate impact]?
>
> A. I don't know. Not that I know of.

Viewing the foregoing testimony in the light most favorable to the Appellants, as the non-moving party, and giving all reasonable inference in Appellants' favor, we conclude that there are disputed material facts concerning the existence of disparate impact in this case. Accordingly, the trial court erred in granting partial summary judgment in favor of Appellees. Because summary judgment was not warranted in this case, we pretermit Appellants' issues concerning the trial and vacate the judgment on the jury verdict.

## V. Conclusion

For the foregoing reasons, we reverse the trial court's grant of summary judgment on the Open Meetings Act claim, and its grant of partial summary judgment on the FHA claims in favor of Appellees. Accordingly, we vacate the trial court's judgment on the jury verdict and remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellees, Cottonwood Associates, LLC, Cottonwood Properties, Inc., Flat Iron Partners, LP; John Coleman Hayes, Jr., Wilrus Company, LLC, and A. Richard Wilson, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE